The plaintiffs, Cyndi and Steven Singleton, appeal from the trial court's summary judgment in favor of the defendants AmSouth Bank and Protective Life Insurance Company. We affirm.
 I.
The Singletons obtained three loans from defendant AmSouth Bank ("AmSouth") from July 1995 to February 1997.[1] In connection with each loan, the Singletons purchased credit-life insurance issued by defendant Protective Life Insurance Company ("Protective"). The Singletons repaid all the loans, and no claim was ever filed on the credit-life insurance. *Page 805 
 A. The Singletons' Complaint
In May 1998, the Singletons sued AmSouth and Protective in the Calhoun Circuit Court alleging that they were sold more credit-life insurance than they needed and seeking to represent a class of similar borrowers charged for alleged excessive credit-life insurance. In their complaint, the Singletons noted that their claims were based on McCullar v.Universal Underwriters Life Insurance Co., 687 So.2d 156 (Ala. 1996), where a plurality of this Court held that Alabama's Mini-Code, § 5-19-1
through § 5-19-32, Ala. Code 1975, prohibits the sale of credit-life insurance in an amount greater than the unpaid balance of the loan plus any accumulated interest. The complaint alleged, in pertinent part, as follows:
"FACTUAL ALLEGATIONS
". . . .
 "15. The amount of credit life insurance sold by [AmSouth and Protective] to the [Singletons] in these instances and the premiums charged for that credit life insurance were in direct violation of the Department of Insurance regulations in that the amount of insurance sold at all times exceeded the approximate unpaid balance of the loan. As a result, the premiums charged for said insurance exceeded the maximum allowed by the regulations of the Alabama Department of Insurance.
". . . .
"CAUSES OF ACTION
"COUNT I
 "FRAUDULENT SALE OF EXCESSIVE CREDIT LIFE INSURANCE
". . . .
 "19. [AmSouth and Protective] were guilty of fraud, deceit, suppression of material facts and/or misrepresentation to the [Singletons] in the sale of this credit life insurance in that [AmSouth and Protective] represented to [the Singletons] that the amount of credit life insurance sold was the amount needed; [AmSouth and Protective] represented to [the Singletons] that they were authorized to sell to them that amount of credit life insurance; [AmSouth and Protective] failed to disclose to [the Singletons] that the amount of credit life insurance sold was more than was needed to pay off the balance of the loan and was in violation of the Department of Insurance regulations governing the sale of credit life insurance and the Alabama `Mini-Code.' [The Singletons] did not discover this fraud until May, 1998. [The Singletons] relied on these misrepresentations to their detriment by purchasing more credit life insurance than was needed or allowed and incurring additional premiums for the purchase of the excessive amount of credit life insurance.
 "20. The fraud committed by [AmSouth and Protective] in this cause was negligently, recklessly, or intentionally committed, and [AmSouth and Protective] consciously or deliberately engaged in fraud which was gross, oppressive or malicious and/or committed with the intent to deceive. In fact, the policy by its own terms would never pay the amount for which it was sold.
". . . .
"COUNT II
 "MINI-CODE VIOLATION IN SALE OF EXCESS CREDIT LIFE INSURANCE
". . . .
 "22. On the dates and occasions complained of, [AmSouth and Protective] were required to make an accurate disclosure of the annual percentage rate, finance charge and other terms of the [Singletons' agreement]. These disclosures were required under the Alabama `Mini-Code' and other applicable law.
". . . . *Page 806 
 "28. A portion of said [disclosed premiums were] for the excess insurance as aforesaid. That portion of the credit life insurance premium paid by the [Singletons] is a charge payable directly or indirectly by [the Singletons] and it was imposed directly or indirectly by [AmSouth and Protective] as incident to the extension of credit to [the Singletons].
 "29. The portion charged by [AmSouth and Protective] for the excess credit life insurance was not a premium for permissible insurance as provided by the Alabama `Mini-Code,' but a finance charge.
". . . .
 "31. [AmSouth and Protective] had a duty to fully and accurately disclose to [the Singletons] the terms of the aforementioned credit transactions and willfully failed to do so.
 "32. The entire charge for credit life insurance was listed and represented to [the Singletons] as part of the `Amount Financed' and it was not disclosed that the portion of the premium for excess Credit Life Insurance was actually a Finance Charge. The fact was intentionally suppressed and misrepresented by [AmSouth and Protective].
". . . .
 "36. That portion of the credit life insurance premium charged for excess credit life insurance constitutes an excess finance charge.
 "37. The excess finance charge made by [AmSouth and Protective] was intentional and part of a fraud, artifice and conspiracy by [AmSouth and Protective] to increase their profits by making excess charges.
". . . .
"COUNT III
"CIVIL CONSPIRACY
". . . .
 "39. [AmSouth and Protective] did, by their actions, join together in a common scheme or design for the purpose of effectuating an intended plan of charging the [Singletons] and class members excessive insurance premiums and interest thereon through fraudulent misrepresentations and conduct and by concealing from the [Singletons] and class members facts concerning same.
". . . ."
The complaint also contained counts alleging negligent hiring and supervision and sought to have the Singletons named as class representatives of a putative class action on behalf of other borrowers who were "charged for excessive credit life insurance of the type involved in this transaction."
In their complaint, the Singletons made clear that their claims were based on the allegation that they were sold excessive credit-life insurance because, they say, the amount of insurance was based on the total face amount of the loan rather than on the remaining unpaid balance of the loan. The Singletons also alleged that Kathy Cook, an AmSouth employee, made misrepresentations to them about the credit-life insurance.
 "3. Kathy Cook, as employee and/or agent and/or officer and/or representative for both defendants, AmSouth Bank of Alabama (`AmSouth') and Protective Life Insurance Company (`Protective'), while in the line and scope of her employment . . . defrauded the [Singletons] by selling excessive credit life insurance as alleged in Count I of the original complaint.
 "4. The Civil Conspiracy Count, Count III, is based on the fraud alleged *Page 807 
in Count I wherein [AmSouth and Protective] sold excessive credit life insurance to [the Singletons] and class members.
 "5. The overt act of [AmSouth and Protective] upon which the Civil Conspiracy Count is based is the representation that the credit life insurance was sold in an amount that would pay off the loans in the event of death. This was a misrepresentation because the amount sold was more than what was needed to pay off the loan. The amount upon which the premiums were based included not only the amount financed, which would have been enough insurance to pay off the loan, but also included the finance charge. Said another way, the premiums were based on `total payments' (Amt-Financed + Finance Charge) but should have been based only on the amount financed (See McCullar v. Universal Underwriters Life Ins. Co., 687 So.2d 156
[(Ala. 1996)]. [The Singletons] and class members were damaged in that they expended extra amounts of money to pay for the excessive insurance, and were caused to pay extra interest because the cost of the excessive insurance was financed."
It is clear from these pleadings that the Singletons' cause of action was based solely on the allegation that Protective and AmSouth, through Kathy Cook, represented to them that the amount of credit-life insurance they purchased was the amount necessary to pay off the respective loans. Further, the Singletons claim that this representation was false because, they say, AmSouth and Protective based the amount of credit-life insurance sold to the Singletons on the total face amount of the loan rather than on the unpaid balance of the loan. Thus the Singletons' cause of action clearly appears to be based on our plurality decision inMcCullar v. Universal Underwriters Life Insurance Co., 687 So.2d 156
(Ala. 1996).
The plaintiff in McCullar alleged that the defendants, a car dealership and a finance company, sold her more credit-life insurance than was necessary to pay off her loan. Specifically, the plaintiff alleged that the defendants sold her an amount of credit-life insurance that at all times exceeded the approximate unpaid balance of the loan. The plaintiff also alleged that the defendants were guilty of fraud because, she said, they represented to her that the amount of credit-life insurance sold was the amount needed and that they were authorized to sell her that amount, and they failed to disclose that the amount of insurance sold to her was more than was necessary to pay off the unpaid balance on the loan.
It was undisputed that the defendants in McCullar had based the amount of credit-life insurance on the face amount of the loan plus the total precomputed interest on the loan. A plurality of this Court held that the applicable banking regulations did not permit the defendants to base the amount of credit-life insurance on the total face amount of the loan, but on the "unpaid balance of the loan" plus any accumulated interest. 687 So.2d at 163-64.
The Singletons' complaint, which cited McCullar, clearly demonstrated that the Singletons' claims were based on McCullar and the allegation that AmSouth and Protective sold them more credit-life insurance than they needed.
 B. AmSouth's and Protective's Motions for a Summary Judgment
By the time AmSouth and Protective filed their separate motions for a summary judgment in August 2000, it was clear that the Singletons' claims were without merit and were not supported by any evidence before the trial court. The applicable *Page 808 
State Banking Department regulation in force at the time of the loans to the Singletons[2] provided as follows:
"(c) Credit Life Insurance.
 "1. The maximum rate for single premium decreasing term credit life insurance shall not exceed eighty cents ($0.80) per hundred ($100) per annum.
 "2. Level term life coverage may be written on single repayment contracts at a rate not in excess of one dollar and sixty cents ($1.60) per hundred ($100) per annum.
 "3. Dual credit life insurance coverage may be written on both the principal debtor and one co-signer to an obligation. The maximum rate for such coverage shall not exceed an amount equal to 150% of the premium rates shown above.
 "4. Rates for premiums payable on other than single premium basis shall not exceed the actuarial equivalent of the rates specified above."
(Emphasis added.)
AmSouth and Protective presented the loan agreements — one signed by the Singletons and two signed by Mr. Singleton alone. It is undisputed that the premiums were payable on an "other than single premium basis." The agreements disclosed how the credit-life insurance premiums were calculated and refuted key allegations of the Singletons' complaint. Each agreement provided as follows:
 "Optional Credit Insurance. Unless this agreement is payable on demand, if you want and if you qualify, we will obtain credit life insurance on you. Credit life insurance is not required to obtain credit and will not be provided unless you sign and agree to pay the additional cost. By signing for credit insurance, you certify that each person to be insured is in good health and that Borrower's age (if insured) is and Co-Borrower's age (if insured) is . We will not get credit life insurance for you unless you sign here."
Each agreement also set forth an estimated total premium for credit-life insurance. The estimated premium for each note was $289.81 (loan no. 9000198411), $34.47 (loan no. 9000280520), and $15.47 (loan no. 9000509338). As explained in the agreement, those premium figures were estimates; they were not necessarily the premiums the Singletons would actually be charged. Each loan agreement executed by the Singletons or by Mr. Singleton contained the following explanations and disclosures regarding credit-life insurance:
 "Credit Life Insurance. If you have elected to purchase credit life insurance by signing the credit life insurance election on the other side of this agreement, and the premiums for the credit life insurance are not included in the amount financed, you agree to the following: Only the life of each Borrower and Co-Borrower who signed the Credit Life Insurance Election is insured. The estimated credit life insurance premium for the scheduled term of this note is shown in the credit life insurance block on the other side of the note: However, the actual credit life insurance premium is calculated on the actual unpaid balance of principal and accrued interest due under this note from time to time, and may vary
depending on whether you make your payments early or late. If paragraph (a) under *Page 809 
the section entitled `How You Will Repay Us' on the other side of this agreement applies to your loan, if the principal of your loan is payable in a single payment, and if you did not pay the credit life premium in cash when you signed this agreement, then the credit life insurance premium is included in the Amount Financed in both principal and interest to maturity are covered by the credit life insurance, if paragraph (b) of that section applies to your loan then the credit life insurance premium is not financed and is not a part of the Amount Financed, and you agree to pay a premium for credit life coverage, payable whenever interest is due, computed at the rate of $.0043836 per day for one insured or $.0065753 for two insureds (or any lesser sum for either number of insured that we may charge from time to time instead) for each $100 of the unpaid balance of principal and accrued interest due under this note from day to day. The credit life insurance covers both principal and interest on the loan."[3]
(Emphasis added.)
It is undisputed that for each loan, paragraph (b) of the section of the loan agreement entitled "How You Will Repay Us" was applicable. Under this repayment option the loans were to be repaid in installments, and the credit-life insurance premiums were not financed and were not a part of the "Amount Financed." According to the agreements, the coverage and premiums were to be based on the unpaid balance of principal and accrued interest.
Mrs. Singleton's deposition testimony acknowledged that she understood that the premiums charged on the loan she had jointly with Mr. Singleton were not charged on the total face amount of the loan plus precomputed interest (or "total of payment"), but were charged, instead, on the "balance of principal and accrued interest":
 "Q. Well, let's see what it says about credit-life insurance. Would you look at — We're looking at Defendant's Exhibit 2 which is the only one of these agreements that you signed, right?
"A. Of these particular —
"Q. Of these three that we're sued on in this case.
"A. Correct.
 "Q. Why don't you just take a minute and read what it says about credit-life insurance.
"Okay.
"Q. Have you read it?
"A. I have.
 "Q. And you're a person who can read and understand a contract, are you not?
"A. I just read it.
"Q. Can you understand a contract like this?
 "A. To the best of my knowledge, it's saying that credit life is calculated in this way and will be paid either up front or in the loan.
 "Q. Right. In fact, this tells you exactly how the premiums for this credit-life insurance were calculated, doesn't it?
"A. It would seem as though. *Page 810 
 "Q. And it tells you that the premiums were not calculated on the total of payments, doesn't it?
"A. It says, `balance of principal and accrued interest.'"
Additionally, AmSouth and Protective submitted detailed loan histories recording the Singletons' loan payments and the amount of the credit-life premiums that were periodically charged. AmSouth and Protective submitted the affidavit of John Eubank, a vice president in AmSouth's lending division, which stated the rates charged for credit-life premiums at the time the loans were made to the Singletons. Furthermore, AmSouth and Protective submitted the affidavit of Michael Presley, a vice president and actuary with Protective. After reviewing the loan histories, which evidenced all payments made on the policies as well as all interest, principal, and insurance charges, Mr. Presley stated in his affidavit:
 "With regard to Loan No. 9000198411, dated July 25, 1995, which contained insurance on the lives of Steven Singleton and Cyndi Singleton, I have reviewed the loan history and confirmed that the credit life insurance premiums charged were charged on an unpaid principal balance using a daily rate of .0059178 dollars for each $100.00 of unpaid balance of principal. Furthermore, the credit insurance premiums on the remaining two notes, #9000280520 and #9000509338, which contained insurance on the life of Steven Singleton, appear to have been calculated using a daily rate of .0039452 for each $100.00 of unpaid principal balance.
 "As stated above, the premiums for the three loans in question were all calculated on the unpaid balance of the loans. None of the premiums were calculated on the gross amount of the loan plus interest. At no time did the credit life insurance for either of these loans provide any more coverage than was required to pay off the balance of the loan.
 "The credit life insurance premium rates charged on each of the loans attached hereto were in full compliance with the Alabama Banking Department Regulations in the rates applied to each of these loans, specifically .0059178 for two insured and .0039452 for one insured, per $100.00 of outstanding principal per day, are the equivalent of $1.20 per thousand per month and $1.80 per thousand per month as evidenced below.
"1.80/1000 = .18/100
.18 x 12 months ÷ 365 = .0059178
"1.20/1000 = .12/100
.12 x 12 months ÷ 365 = .0039452"
Finally, AmSouth and Protective presented the Singletons' own deposition testimony to refute the allegations that AmSouth's agent, Kathy Cook, made fraudulent mis-representations that the Singletons relied on. In fact, the Singletons admit Kathy Cook made no misrepresentations. Cyndi Singleton testified:
 "Q. I want to ask the question this way one time and then I'll get into more detail. What statement, if any, did Kathy Cook ever make to you that wasn't true?
"A. None, to the best of my knowledge."
Steven Singleton testified as follows:
 "Q. Do you know of any time that Kathy Cook has ever told you anything that wasn't true?
"A. No."
If taken as true, AmSouth's and Protective's factual submissions showed that they were entitled to a summary judgment on the claims set forth in the Singletons' complaint, because they established that the *Page 811 
Singletons, unlike McCullar, were not sold excessive insurance and that there was no evidence that any misrepresentations had been made to them in regard to the insurance. The Singletons did not dispute any of the evidence submitted by AmSouth and Protective.
 C. The Singletons' Excessive-Premiums Allegation
In response to AmSouth's and Protective's motions for a summary judgment, the Singletons, without amending their complaint, made a new allegation: that they were charged "excessive insurance premiums for credit life insurance." In support of this allegation, the Singletons submitted the affidavits of two certified public accountants, Michael Askew and Wray Pearce. It is undisputed that Regulation 4(c) of the State Banking Department Regulations, as amended May 22, 1991, and effective at the time of these loans, provided the applicable rate:
 "1. The maximum rate for single premium decreasing term credit life insurance shall not exceed eighty cents ($0.80) per hundred ($100) per annum.
". . . .
 "4. Rates for premiums payable on other than single premium basis shall not exceed the actuarial equivalent of the rates specified above."
(Emphasis added.)
It is also undisputed that the premiums the Singletons paid for the credit-life insurance were "payable in other than single premium basis." Therefore, the maximum rate AmSouth and Protective were allowed to charge was the "actuarial equivalent" of the rates specified in subsection (c)(1) of Regulation 4. However, in neither affidavit relied on by the Singletons did the certified public accountants claim to have determined the actuarial equivalent of the specified rates.
In response to the Singletons' new allegation, AmSouth and Protective produced the affidavit of an independent actuary, Steven L. Ostlund, and the affidavit of James Whitehead, a supervisor with the Bureau of Loans of the State Banking Department. Mr. Ostlund's affidavit calculated the actuarial equivalent of the single premium rate of 80 cents per $100 per annum specified in Regulation 4(c)(1) and determined that the actuarial equivalent of that rate was $1.23 per $1,000 per month. Mr. Ostlund testified that, after reviewing the loan documents, he was of the opinion that the credit-life insurance rates applied to the Singleton loans were less than the actuarial equivalent of $.80 per $100 per annum and were therefore in compliance with Regulation 4(c). The affidavit of James Whitehead confirmed Mr. Ostlund's actuarial calculation. Whitehead's affidavit states that the State Banking Department has actually adopted and used this actuarial calculation in the most recent revision of the subject regulation:
 "The Banking Department regulations in effect at the time of the Singleton loans provided that rates for premiums payable on other than a single premium basis, as the Singleton premiums were, should not exceed the actuarial equivalent of eighty cents ($0.80) per hundred per annum and 150 percent of that rate for dual credit life insurance coverage. The actuarial equivalent of eighty cents ($0.80) per annum is $1.23 per month per $1,000.00 of the outstanding insured indebtedness. The Banking Department used this actuarial equivalent ($1.23/month/$1,000.00) when amending its credit life insurance regulations in 1997 and incorporated and adopted the $1.23/month/$1,000.00 as the maximum allowable rate for credit life insurance. See 155-2-2-.12 of the Alabama Consumer Credit Act [Regulations]." *Page 812 
Mr. Whitehead also concluded that "the credit life insurance premiums charged to the Singletons . . . were in compliance with the applicable Banking Department regulations," and were, in fact, "less than those allowed by law."
 D. Trial Court's Summary Judgment
Initially the trial judge, Judge Joel Laird, denied AmSouth's and Protective's motions for a summary judgment without a written order. Shortly thereafter Judge Laird recused himself from the case and was replaced by Judge Samuel Monk. AmSouth and Protective presented renewed and supplemental motions for a summary judgment before Judge Monk. Judge Monk granted the motions for a summary judgment. The order stated:
 "[AmSouth and Protective] contend that the rates charged the [Singletons] were in compliance with the applicable regulation and, in fact, were less than the maximum allowable rates. [AmSouth and Protective's] contention is wholly supported by the affidavit testimony of James A. Whitehead. Mr. Whitehead and the Department of Banking specifically found that the credit life insurance rates applied and charged in the case were less than the actuarial equivalent of those rates allowed by law at the time of the [Singletons'] loans. Mr. Whitehead further concluded that the actual premiums charged to the [Singletons] in this case complied with the applicable Banking Department regulation.
 "In opposition to [AmSouth's and Protective's] Motion[s], the [Singletons] have filed the affidavits of two certified public accountants . . . [T]his Court finds that the affidavits do not address the primary issue of actuarial equivalence. . . .
 "After having considered all of the evidence submitted, this Court specifically finds that the premiums charged the [Singletons] were not calculated on the `total payments' (gross amount) as alleged by the [Singletons] but were in fact based upon the actual unpaid balance of principal and accrued interest. Furthermore, this Court finds that the premiums charged by [AmSouth and Protective] were in compliance with the Alabama State Banking Department Regulation 4(c) as amended on May 22, 1991."
The trial court also concluded that there was no evidence of any misrepresentations concerning the credit-life insurance coverage; it therefore found that the Singletons had failed to present substantial evidence of fraudulent misrepresentation. The trial court also found there was no evidence to support a suppression claim because the loan documents provided to the Singletons clearly disclosed how the premiums for the credit-life insurance were calculated.
 II.
On appeal, the Singletons argue that the affidavit testimony of Michael Askew and Wray Pearce demonstrated that a question of material fact existed as to whether the Singletons were charged excessive premiums for credit-life insurance. The Singletons also claim that there is substantial evidence of fraud on the part of AmSouth and Protective because, they say, the disclosures made by AmSouth and Protective to the Singletons included only estimates of credit-life insurance premiums to be paid. The Singletons did not submit to this Court a reply brief in response to the briefs submitted by AmSouth and Protective.
 A. Standard of Review
When reviewing a trial court's summary judgment, this Court reviews the record in a light most favorable to the *Page 813 
non-movant, resolving all reasonable doubts against the movants, to determine whether there is a genuine issue of material fact and whether the movants are entitled to a judgment as a matter of law. Copeland v.Samford Univ., 686 So.2d 190, 191 (Ala. 1996). A summary judgment is proper when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala.R.Civ.P. In determining whether there is a genuine issue of material fact, this Court is limited to considering the factors that were before trial court when it entered the judgment. Broadmoor Realty, Inc. v. First NationwideBank, 568 So.2d 779, 782 (Ala. 1990).
"The moving party bears the burden of negating the existence of a genuine issue of material fact and showing that it is entitled to a judgment as a matter of law." White v. Howie, 677 So.2d 752, 753
(Ala.Civ.App. 1995). "In order to defeat a properly supported motion for summary judgment, the opposing party must present substantial evidence creating a genuine issue of material fact." Voyager Guar. Ins. Co. v.Brown, 631 So.2d 848, 849 (Ala. 1993).
 B. Analysis
As stated above, the Singletons' complaint presented a claim underMcCullar, i.e., that AmSouth and Protective sold them more credit-life insurance coverage than they needed. When AmSouth and Protective submitted evidence in support of a summary judgment that conclusively disproved any theory of recovery consistent with McCullar, the Singletons' main argument shifted. They then argued that AmSouth and Protective had overcharged them for the credit-life insurance by calculating the premiums using rates that were too high. On appeal, however, it appears that the Singletons' argument has again evolved in an attempt to locate an issue of disputed fact — they now claim that the affidavits of the two certified public accountants they offered in opposition to the summary-judgment motions create a question of how the rates by which premiums were calculated were applied to the loan amount.
In their brief, the Singletons now concede that the rates "may be proper," but assert that the rate "was applied to the wrong loan amount or that by some other mathematical [slight] of hand they were overcharged." After more than four years of litigation and discovery, the Singletons now suggest that "the method of calculation can be determined through discovery." We disagree. Without determining whether the Singletons' present allegations were sufficiently pleaded in their complaint to merit our review, see Bethel v. Thorn, 757 So.2d 1154, 1158 (Ala. 1999), we find that it is obvious from the record that there is no evidence, much less substantial evidence, to support any of the Singletons' allegations.
The Singletons have provided no evidence of AmSouth's and Protective's alleged violation of the Mini-Code. The rates by which the premiums were calculated were disclosed to the Singletons and that disclosure is documented in the record; the calculations were verified by two actuaries and by the State Banking Department. The Singletons provided no evidence as to how a simple-interest loan, where every element of the charge is disclosed and that disclosure is reported in the record, could, as they allege in their brief, implicate "mathematical slight of hand" or "undisclosed complexity." If the rate was applied to the "wrong loan amount," it would be explicitly obvious on *Page 814 
the written record of the loan histories (the accuracy of which has never been disputed), where every charge was disclosed.
Not only is there no evidence to support their claim that "AmSouth and Protective use a complex and undisclosed method to calculate charges," this claim is also refuted by the record. Even without reference to the verifications by the expert actuaries and the State Banking Department, this Court was able to take the rates and the monthly loan balances, as shown on one of the loan histories in the record, and verify that each charge represented the stated premium rate multiplied by the present balance and the number of days since the last payment. The record simply does not support the Singletons' claims that they were charged excessive premiums or that they were sold excessive insurance coverage.
Furthermore, the Singletons' argument in support of their fraud claim — that the premium disclosures were inaccurate because they were merely estimates — is pure sophistry. As explicitly disclosed, the Singletons' premiums were calculated on a daily basis. Therefore, the precise amount of each month's premium varied slightly depending upon when the Singletons made payments on the loans. This fact was accurately disclosed, and cannot therefore be evidence of a misrepresentation. The Singletons failed to present evidence of the most essential element of fraud by misrepresentation: that the defendant made a false representation concerning an existing material fact. Luck v. PrimusAuto. Fin. Servs., Inc., 763 So.2d 243, 245 (Ala. 2000).
Likewise, the Singletons' suppression claim is equally without merit. In their brief, the Singletons allege that AmSouth and Protective suppressed the method by which they calculated credit-life insurance premiums through their "use [of] a complex and yet undisclosed method to calculate the charges to the Singletons for credit insurance." The record simply does not support this contention. Instead, the record reveals that the premiums for credit-life insurance were calculated exactly as the loan documents signed by the Singletons said they would be calculated. It is well settled that, under Alabama law, there can be no suppression if the information allegedly suppressed is in a form signed by the party complaining about the suppression. Locklear Dodge City, Inc. v.Kimbrell, 703 So.2d 303 (Ala. 1997).
The Singletons' civil-conspiracy claim also fails as a matter of law. "In order to succeed on a civil-conspiracy claim, a plaintiff must prove a concerted action by two or more people that achieved an unlawful purpose or a lawful end by unlawful means." Luck, 763 So.2d at 247. "`Where civil liability for a conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy alleged but the wrong committed.'" Purcell Co. v.Spriggs Enters., Inc., 431 So.2d 515, 522 (Ala. 1983) (quoting O'Dell v.State ex rel. Patterson, 270 Ala. 236, 240, 117 So.2d 164, 168 (1959)). Because we have determined that the Singletons' claims of Mini-Code violations, fraudulent misrepresentation, and suppression fail as a matter of law, the conspiracy claim must also fail because there is no "actionable wrong" to support a conspiracy theory. See Id.
 III. Conclusion
We are troubled in this case by the fact that there never seemed to be any evidence of a wrong or an injury to the Singletons. When undisputed evidence disproved the allegations in their complaint, the Singletons, undaunted, presented *Page 815 
equally untenable allegations regarding premium rates. We further note that on appeal the Singletons failed to submit a reply brief. Considering the strength of the arguments contained in the briefs submitted by AmSouth and Protective, we have a hard time believing that the Singletons' failure to reply was anything other than a tacit admission of an illegitimate claim. If the briefs submitted by AmSouth and Protective lead the Singletons to doubt the viability of their claim to the point that they decided not to waste time on a reply, they should have moved to dismiss their appeal.
We find that the Singletons' claims are not supported by substantial evidence; therefore, the trial court's summary judgment is affirmed.
AFFIRMED.
LYONS and JOHNSTONE, JJ., concur.
MOORE, C.J., and WOODALL, J., concur in the result.
[1] The Singletons borrowed the following amounts from AmSouth: on July 25, 1995, Cyndi and Steven Singleton borrowed $5,550 (loan no. 9000198411); on January 16, 1996, Steven Singleton borrowed $1866.50 (loan no. 9000280520); on February 28, 1997, Steven Singleton borrowed $1,050 (loan no. 9000509338).
[2] Effective August 1, 1997, the State Banking Department adopted new regulations, repealing all prior regulations adopted pursuant to the Mini-Code. The regulation addressing credit-life insurance is now no. 155-2-2-.12(2), Alabama Consumer Credit Act Regulations.
[3] Although the loan agreement dated July 25, 1995, provided that credit-life coverage premiums would be calculated at a rate of $.0043836 per day for one insured and $.0065753 for two insured for each $100 of the unpaid balance of the loan, the premiums for all three loans were actually calculated using an updated lower rate of $.0039452 per day for one insured and $.0059178 for two insureds.