431 So.2d 515 (1983)
PURCELL COMPANY, INC., a Corporation, and Lake Forest, Inc., a Corporation,
v.
SPRIGGS ENTERPRISES, INC., an Alabama Corporation, and Delta Oil Company, a Corporation.
GULF OIL CORPORATION, a Corporation,
v.
SPRIGGS ENTERPRISES, INC., a Corporation, et al.
Nos. 80-600, 80-670.
Supreme Court of Alabama.
April 8, 1983.
*517 Broox G. Holmes, Christopher I. Gruenewald, and Roy W. Scholl, III of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, for appellants Lake Forest, Inc. & Purcell Co., Inc.
Wesley Pipes of Lyons, Pipe & Cook, Mobile, and Douglas Arant and Samuel H. Franklin of Bradley, Arant, Rose & White, Birmingham, and Taylor D. Wilkins of Wilkins, Bankester & Biles, Bay Minette, for appellant Gulf Oil Corp.
E.E. Ball, of Owen & Ball, Bay Minette, for appellee.
PER CURIAM.
The opinion originally released in this cause on December 30, 1982, is withdrawn and the following is substituted therefor:
This action, brought on theories of fraud, civil conspiracy, interference with business or contractual relations, and breach of contract claims, is before this Court for the second time. On the first appeal, a new trial was ordered by this Court because plaintiff, Spriggs Enterprises, Inc., was both granted specific performance and awarded damages under inconsistent theories of relief. These appeals are from a judgment for Spriggs after a second trial predicated on damages theories only.
The underlying transactional facts, as stated in the opinion on the first appeal, Gulf Oil Corporation v. Spriggs Enterprises, Inc., 388 So.2d 518 (Ala.1980), are as follows:
"On June 21, 1972, Lake Forest, Inc., a real estate developer which is a whollyowned subsidiary of Diamondhead Corporation, sold some real property along U.S. 98 just off I-10 to Dixon Shell Service Station, Inc. (That corporation later became *518 Spriggs Enterprises, Inc.) During the negotiations prior to the sale Spriggs and Dixon, the initial partners in this enterprise, obtained a commitment in a personal letter[1] from Ralph Prince, who was at that time national sales manager for Diamondhead, that Diamondhead would not sell any of its property north of or between the Spriggs property and I-10 for the purpose of an `automotive service station,' making the Spriggs station the first station off of I-10. Spriggs recorded this letter in the office of the Judge of Probate in Baldwin County. In November, 1972, Spriggs opened its service station supplied with Shell products by Mothershed Oil Co., Inc.
"In November, 1976, Diamondhead began negotiations to sell the property between Spriggs' Shell station and I-10 to Gulf Oil. Even though Diamondhead and Lake Forest felt that the Prince letter had no binding effect, the deed executed by Lake Forest to Gulf in December, 1976, specifically stated that the purchaser agreed and it became a covenant running with the property that the land sold would be used solely for the construction of `one convenience store with no more than two islands for self-service gasoline pumps.' This deed was also recorded. The property was cleared but the Gulf station has never been built."
Diamondhead is now Purcell Company, Inc.
Before the second trial, after remand, Spriggs amended its complaint by striking all claims for declaratory and injunctive relief, choosing to proceed on the claims for monetary damages. Delta Oil Company, Inc., was added as a real party in interest after the defendants discovered that an agreement existed between Spriggs and Delta whereby the proceeds of any successful prosecution of this action would be shared equally.[2]
The case was tried to a jury for a second time on February 3, 1981. It returned three separate jury verdicts in favor of the "plaintiff"; against Gulf for the sum of $1,000,000, against Purcell Company, Inc., for the sum of $662,500, and against Lake Forest, Inc., for the sum of $662,500. These defendants each timely filed motions for a directed verdict, raising specific objections to each theory upon which Spriggs sought damages, at the close of Spriggs's case and at the conclusion of all the evidence. All motions were denied. On March 5, 1981, the defendants filed post-trial motions for J.N.O.V., or alternatively, for a new trial. The motions were denied.
The thrust of defendants' arguments is, among other things, that plaintiffs failed to produce a scintilla of evidence that they had suffered any actual damage, loss, or injury or that they were entitled to an award of punitive damages. It is also argued that plaintiffs proved no right to recover under any cognizable theory of law.
Because the dispositive issue in this case revolves around the sufficiency of the evidence, we first address our standard of review in analyzing that question. A trial court will not be reversed for refusing to direct a verdict in favor of a movant if a scintilla of evidence exists in favor of the party opposing the motion. Examining the evidence most favorably to the plaintiffs in this case, we cannot find a scintilla of evidence justifying submission of this case to the jury.
We examine each claim separately to determine whether the trial court erred in *519 submitting it to the jury, tested by the scintilla rule:

The Fraud Count
Defendants Lake Forest and Purcell contend the trial court erred in denying their motion for directed verdict and motion for judgment notwithstanding the verdict as to the fraud claim.
The only basis upon which one may recover for fraud, where the alleged fraud is predicated on a promise to perform or abstain from some act in the future (here, that no other "automotive service station" would be built between Spriggs's gas station and I-10), is when the evidence shows that, at the time of the promises of future action or abstention were made, the promisor had no intention of carrying out the promises, but rather had a present intent to deceive. Robinson v. Allstate Insurance Co., 399 So.2d 288 (Ala.1981). If such intent is not substantiated by the evidence, the fraud claim should not be submitted to the jury. The failure to perform, alone, is not evidence of intent not to perform at the time the promise was made. If it were, a mere breach of contract would be tantamount to fraud. Old Southern Life Insurance Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976). On this point, under the peculiar, and particular, facts of this case, our careful and thorough review of the record discloses no evidence which supports the jury's conclusion that, at the time of the conveyance to Spriggs in 1972, Lake Forest and Purcell did not intend to perform the promise alleged to bind them. There were no pending negotiations for sale of the property in question for an automotive service station on or prior to June 21, 1972; there had been no attempt to procure a purchaser for same; and there had been no statements or actions evidencing an intent not to perform at that time. It is apparent from the evidence that Lake Forest and Purcell did not have a present intent to defraud Spriggs in 1972, since the former were not even aware, until 1976, that Gulf was considering purchasing the property to the north of the Spriggs Shell station. To the contrary, as it appears from the evidence, each party thought the Prince letter was a confirmation of their oral agreement; it was not disputed in 1972, and Lake Forest and Purcell abided by that agreement according to their interpretation of its meaning. The evidence is crystal clear regarding defendants' good faith attempt to preserve any rights Spriggs may have acquired under the Prince letter. That letter was posted on the Lake Forest sales lodge bulletin board from 1972 to 1976 in an effort to ensure that the property would not be sold for use as an automotive service station; Lake Forest incorporated into the warranty deed to Gulf the "convenience store" restriction; and in January, 1981, Lake Forest and Gulf executed a corrective instrument[3] which encumbered the property so that it could not be used for an "automotive service station, a convenience store with self-service gasoline pumps, or any use inconsistent with [the Prince letter]."
Ordinarily, intent is a matter peculiarly within the province of the trier of facts. Walker v. Woodall, 288 Ala. 510, 262 So.2d 756 (1972). However, the jury has no untrammeled discretion to speculate upon the existence of fraudulent intent. Any finding on the issue must be based on reasonable inferences from the evidence, and intent to defraud must be clearly proved by a preponderance of the evidence. Universal Brokers, Inc. v. Higdon, 56 Ala.App. 184, 320 So.2d 690 (1975); Boulevard Chrysler-Plymouth v. Richardson, 374 So.2d 857 (Ala. 1979) (Torbert, C.J., dissenting). There is nothing in the record of this particular case from which fraudulent intent on the part of Lake Forest or Purcell could be inferred.
A second element required to be proved in a fraud claim is actual damage resulting from the alleged fraudulent act. Amason v. First State Bank of Lineville, 369 So.2d 547 (Ala.1979).

*520 "Injury is not merely a consequence following the fraud alleged, but is an essential element of wrong. There can be no recovery of even nominal damages where the Plaintiffs fail to show injury sufficient to sustain an action of fraud. The elements of fraud and damage must concur to give rise to an action for damages."
Mobile Building & Loan Ass'n v. Odom, 232 Ala. 19, 21, 166 So. 698, 700 (1936). An examination of testimony in the record taken at trial reveals absolutely no evidence from which the jury could infer that Spriggs or Delta Oil sustained any actual injury, loss, or damage, either in a decline in value of the Spriggs property or in lost profits by virtue of the 1976 deed from Lake Forest to Gulf.
Our examination of the testimony taken at both trials points to the correctness of our findings that plaintiffs here suffered no damages. Lamar Mothershed, now retired, president of Mothershed Oil, the Shell distributor which supplied the Spriggs station with all the gasoline it sold, testified, although incongruously, at both trials as follows:
"BY MR. BALL: [on direct]
". . . .
"Q What, in your opinion, was the value of that property immediately before Gulf recorded their deed?
"A In my opinion the property and the improvement would be worth approximately four hundred and fifty thousand dollars.
"Q All right. Do you have an opinion as to the value of that property after that property north of them was sold to Gulf and they were no longer first off?
"[Objections omitted.]
"A My opinion it would be worth about three hundred and twenty-five thousand.
"Q Now, is this opinion even assuming that no gasoline is pumped there on that site north of the Shell station?
"A In other words, once the deed was recorded in another major oil company's name, I think it would reduce the value for that moment."
On cross-examination, however, Mothershed contradicted himself considerably when testifying about the decline in value of the property:
"BY MR. WILKINS:
"Q Mr. Mothershed, what is the value, in your opinion of the Spriggs property today?
"A Well, the present-day market value, I would say between four fifty and five hundred thousand.
". . . .
"[In connection with the corrective instrument]
"Q You can answer. What is the value of it today now that this deed is on record with the restrictions?
"A Well, assuming you could never sell petroleum products on that location, then it would have no effect as to the value, the market value of the property; going on that assumption.
"Q Would your opinion then still be it is worth four hundred and fifty to five hundred thousand?
"A On that assumption there would never be any petroleum products sold between them and the interchange of I-10.
". . . .
"BY MR. HOLMES:
"Q Mr. Mothershed, now this Lake Forest Shell station, that is at the present time is the first location off of interstate south, is that correct?
"A That's in business, yes, sir.
"Q As I understand it, to make it clear, if no gas is pumped on the property between Shell and the interstate, then there is no decrease in the value of the property, is that your testimony?
"A Not in the value of the property.
"MR. HOLMES: All right, sir. No further questions."
At the first trial, Mothershed testified that the decline in property value was premised on the construction of a Gulf station and not merely on recordation of the deed:

*521 "Q I think you testified that there was a hundred and twenty-five thousand dollars difference in there as a result of this deed being recorded?
"A It would be a hundred and twenty-five thousand dollars, yes, sir.
"Q If a gallon of gas is never pumped from that location then what is the difference, in your opinion?
"MR. OWEN: Which location?
"MR. WILKINS: He knows what I'm talking about.
"MR. OWEN: Well, I don't and I'm entitled to know also, Mr. Wilkins.
"MR. WILKINS: If no gas, if this Jury says gas can't be pumped at that location, the Gulf location, then what is your opinion?
"A Well, strictly the sale of gasoline I would go back to the original figure.
"Q Then how much would it be worth?
"A Four fifty.
". . . .
"Q Now, I think you testified if no gas is pumped from that location then it's worth four hundred and fifty thousand?
"A Right."
Herman Spriggs, who purchased the property from Lake Forest and who owns the Spriggs Shell station, testified that the value of his property has not decreased because of the deed to Gulf and will not unless gas is sold from the Gulf property.
"BY MR. PIPES:
"Q Well, let me start over. Haven't you testified before that the value of the Lake Forest Shell Service Station property, this piece of property that this lawsuit is about, has not decreased because of the deed from Lake Forest to Gulf as long as gas is not sold or pumped on the Gulf property?
"A That I don't remember exactly, but that sounds like, you know, logical to me.
"Q That was the substance of it, wasn't it?
"A Yes, sir.
"Q Unless gas is sold on the Gulf property, the value of the Spriggs Enterprises property has not been diminished is that correct?
"A That's the way I believe, you know."
Spriggs also testified there had been no decrease in the profits of his business as a result of the deed.
"Q Mr. Spriggs, you had testified before that Spriggs Enterprises has not lost any profits as a result of the deed from Lake Forest to Gulf, is that correct?
"A Yes, sir.
"Q Is that still true today?
"A Profits, yes, sir."
At the first trial, Spriggs further testified that the value of his property has increased since execution of the deed to Gulf:
"Q Is your property, that is your Shell Service Station property worth more today than it was in January of 1977?
"A I'm not an expert on real estate but I would say the way things are going that it is.
Additionally, the jobber's representative for Shell Oil Company, Mike Carpenter, who supplied Spriggs with gasoline, testified that Spriggs's volume of gasoline pumped had been steadily increasing since the 1976 Gulf deed. In fact, plaintiffs' own exhibits indicate that is the case.
The evidence, in its entirety, woefully fails to establish that plaintiffs suffered damage, injury or loss as a result of the deed to Gulf in 1976. Plaintiffs' failure to prove this is a fatal defect in their proof of a prima facie case of fraud. We, therefore, opine that the trial court erred as a matter of law in failing to grant defendants' motions for directed verdicts and judgments non obstante veredicto.
The Intentional Interference Counts
Defendant Gulf contends the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict as to plaintiffs' intentional interference claims. Spriggs and Delta Oil contend that Gulf entered into the land purchase transaction with intent to interfere *522 with the business relations of Spriggs and with intent to procure a breach of the agreement allegedly set forth in the Prince letter between Spriggs and the co-defendants.
Generally, Alabama does not recognize a cause of action for tortious interference with a contract. Homa-Goff Interiors, Inc. v. Cowden, 350 So.2d 1035 (Ala.1977).
There are two exceptions to this rule which were enumerated by the Court in Erswell v. Ford, 208 Ala. 101, 94 So. 67 (1922). One is where an employee is enticed to leave his employment, and the second is where a party has been procured against his will or contrary to his purpose, by coercion or fraud, to break his contract with another.
There is a complete absence of any evidence in the record from which one might find any form of fraud or coercion. We find the evidence overwhelming that Gulf's intent from the beginning of the land purchase negotiations was to act consistently with the recognition of any possible interests Spriggs might have by virtue of the Prince letter, if it was binding and enforceable. The purchase by Gulf was unquestionably an arm's-length transaction with Lake Forest, in which Gulf acted for legitimate economic reasons. Gulf made no misrepresentations to Lake Forest, nor did it falsely induce it in anywise to make the property conveyance. No facilities have been constructed on the property, and Gulf has now put the property on the market for sale.
Under Alabama law, a prima facie case for intentional interference with another's business is established by showing an intentional act of interference and some consequential harm to the plaintiff's business. Thompson v. Allstate Insurance Co., 476 F.2d 746 (5th Cir.1973). As we have pointed out in the facts stated above, we can find no intentional, malicious or wrongful acts on the part of Gulf or any other defendants. Furthermore, we have found no evidence in the record that plaintiffs suffered any actual damage, injury, or loss, as a result of the property transaction.
As plaintiffs' evidence from the record is insufficient to sustain a cause of action for wrongful interference with business or contractual relations, we are again compelled to find that the trial court erred as a matter of law in failing to grant defendants' motions for directed verdicts and judgments non obstante veredicto.

The Civil Conspiracy Count
In essence, civil conspiracy is a combination of two or more persons to do: (a) something that is unlawful; (b) something that is lawful by unlawful means. Snyder v. Faget, 295 Ala. 197, 326 So.2d 113 (1976). It is well settled that Alabama recognizes the cause of action as a substantive tort. Snyder, supra.
Spriggs and Delta Oil here contend that Lake Forest, Purcell, and Gulf conspired to interfere with their business and that the trial court was correct in submitting this issue to the jury. The conspiracy claim charged, in substance, that the alleged wrongful interference by Gulf with Spriggs's business or contractual relationship was the product of an agreement or combination by the defendants to produce that result.
Again, we have searched the record carefully on this issue and fail to find any evidence to support plaintiffs' theory.
The evidence in this case demonstrates, without room for dispute by reasonable persons, that the transaction between the defendants was at arm's-length and commercially reasonable.
"Where civil liability for a conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy alleged but the wrong committed." O'Dell v. State ex rel. Patterson, 270 Ala. 236, 240, 117 So.2d 164, 168 (1959). Since we have already determined that Spriggs failed to establish a prima facie case of tortious interference as a matter of law, the conspiracy claim must also fail because there is no "actionable wrong" to support the latter theory. Griese-Traylor Corp. v. First National Bank, 572 F.2d 1039 (5th Cir.1978).
*523 Damages must also be proved. The substance of a conspiracy action is the damage and not the conspiracy, and the damage must appear to have been the natural and proximate result of defendants' acts. Louisville & N.R. Co. v. National Park Bank, 188 Ala. 109, 65 So. 1003 (1914).
Plaintiffs, in this particular case, have shown neither damages nor an actionable wrong to support their conspiracy theory. As a result, we find the trial court erred as a matter of law in failing to grant defendants' motions for directed verdicts and judgments non obstante veredicto.

The Breach of Contract Count
Absent proof of actual damage or injury, there can be no recovery for breach of contract. Cocke v. Odom, 385 So.2d 1321 (Ala.Civ.App.1980); Ashland-Warren, Inc. v. Sanford, 497 F.Supp. 374 (M.D.Ala.1980). Because we find no damage done plaintiffs in this case under the evidence of record, like the previously discussed counts, this one should not have gone to the jury.

Punitive Damages
No damages, whether compensatory or punitive, may be awarded absent a finding of actual injury. Skipper v. South Central Bell Telephone Co., 334 So.2d 863 (Ala.1976). The evidence is undisputed that Spriggs's business has never suffered any damages, actual or otherwise, as a result of the property conveyance by Lake Forest to Gulf or any subsequent action of Gulf, Lake Forest or Purcell. Accordingly, the issue of punitive damages was improperly submitted to the jury for its consideration.
In summary, this Court has considered all of the evidence in this case, not just the evidence supporting the contentions of the appellants Gulf, Lake Forest, and Purcell; and it has considered all that evidence, and all reasonable inferences to be drawn from it, in a light most favorable to Spriggs and Delta Oil.
After so doing, we find that neither the evidence nor any reasonable inferences arising therefrom furnish a scintilla in support of the theories of plaintiffs. Furthermore, we find those facts and inferences so overwhelming as to lead any reasonable person to draw the same conclusion. Therefore, this Court is compelled to set aside the verdicts and judgments below and hereby enter judgments in favor of defendants Purcell Company, Inc., Lake Forest, Inc., and Gulf Oil Corporation.
ON REHEARING EX MERO MOTU ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND RENDERED.
MADDOX, FAULKNER, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
TORBERT, C.J., and EMBRY, J., concur specially.
JONES, J., not sitting.
TORBERT, Chief Justice (concurring specially).
I agree that the original opinion was confusing to the bench and the bar. This confusion occurred because six of the Justices joined my special concurrence which disagreed with the purported rejection of the scintilla rule in the opinion written by Justice Embry. In effect, the opinion of the Court was contained in that special concurrence. To eliminate the confusion engendered thereby, my views concerning the scintilla rule have been incorporated into the substituted main opinion, which expresses the view of a majority of the Court.
EMBRY, Justice (concurring specially):
I concur that the trial court erred in refusing to grant a directed verdict on each of the plaintiffs' theories of recovery. I would not, however, continue to adhere blindly to the so-called scintilla rule.
No matter what it is called, the so-called scintilla rule is contradictory to common sense, judicial expediency, and fairness. It is meaningless to submit an issue to the jury on such an insufficient amount of evidence that, on a motion for new trial, the *524 trial court is under a duty to set aside that verdict although there was a scintilla of evidence in favor of the party receiving a favorable verdict. See Hodges & Co. v. Albrecht, 288 Ala. 281, 259 So.2d 829 (1972). The logical rule would be that the trial court, in ruling on a motion for directed verdict or motion for J.N.O.V., must find the evidence of sufficient probative value or sufficient substance that, if a jury returns a verdict based upon it, that evidence would support the verdict and the trial court would be under no duty to set it aside even though required to submit the case to the jury in the first instance.
NOTES
[1] "`June 20, 1972

"`Dixon's Shell Service Station, Inc. Highway 90 Spanish Fort, Alabama
"`This letter will confirm our agreement that Diamondhead Corporation will not sell any of its properties North and between Interchange of I-10 and Dixon's Shell Service Station, Inc. property for the purpose of an automotive service station.
"`It is also agreed that any fill dirt that may fall either North or South of Dixon's Shell Service Station, Inc. property that Diamondhead Corporation will hold you Dixon's Shell Service Station, Inc. harmless.
 "`Ralph M. Prince'"

[2] Delta, a supplier of oil products to Spriggs, was formerly Mothershed Oil Company, Inc. Mothershed was a plaintiff in this action but was dismissed by amendment in the first trial of this case in 1979.
[3] According to the undisputed testimony at trial, Gulf, prior to the second trial, put its property on market for sale after executing a corrective instrument along with Lake Forest specifically encumbering the property by the restrictive covenant set out in the opinion.