963 So.2d 614 (2007)
Ex parte Thomas M. REINDEL, Tommy N. Kellogg, and Victoria J. Seeger.
(In re Alabama Hospital Association et al.
v.
General Reinsurance Corporation et al. and
Baptist Health System, Inc.
v.
General Reinsurance Corporation et al.)
1051021.
Supreme Court of Alabama.
March 2, 2007.
*615 James H. Anderson of Beers, Anderson, Jackson, Patty & Van Heest, P.C., Montgomery, for petitioners.
J. Michael Rediker, J. Vernon Patrick, Peter J. Tepley, John M. Fraley, Charles M. Elmer, Michael C. Skotnicki, Page A. Poerschke, and Vincent J. Graffeo of Haskell Slaughter Young & Rediker, LLC, Birmingham; and Thomas T. Gallion III and Jamie A. Johnston of Haskell Slaughter Young & Gallion, LLC, Montgomery, for respondent Alabama Hospital Association et al.
W. Percy Badham III, Robert W. Tapscott, Jr., and Will A. Smith of Maynard, Cooper & Gale, P.C., Birmingham; and Randall S. Haynes and Larry W. Morris of Morris, Haynes & Hornsby, Alexander City, for respondent Baptist Health System, Inc.
WOODALL, Justice.
Thomas M. Reindel, Tommy N. Kellogg, and Victoria J. Seeger petition this Court for a writ of mandamus directing the Montgomery Circuit Court to vacate its order denying their motion to dismiss the plaintiffs' claims against them in consolidated *616 actions pending in that court on the basis of lack of in personam jurisdiction. We deny the petition.
The plaintiffs in the first-filed action, CV-2004-1172,[1] are the Alabama Hospital Association and 33 Alabama hospitals, which, at all relevant times, were members of the Alabama Hospital Association Trust ("the trust"), organized pursuant to Ala. Code 1975, § 22-21-240 et seq. The Alabama Hospital Association and the 33 member hospitals are hereinafter referred to collectively as "AHAT."[2] The plaintiff in the second-filed action, CV-2004-1757,[3] is Baptist Health System, Inc. ("BHS"), an Alabama corporation that operates hospitals, which was also a member of the trust. The two actions have been consolidated in the trial court.
The petitioners, defendants below, are vice presidents of General Reinsurance Corporation ("Gen Re") and residents of Connecticut. Although Gen Re, a Delaware corporation with its principal place of business in Connecticut and licensed to do business in Alabama, is also a defendant, it is not a party to this mandamus proceeding.

I. Procedural Background
The allegations in the complaints center on the petitioners' dealings with Reciprocal of America ("ROA")  a Virginia-based reciprocal insurer, which provided insurance and reinsurance to hospitals, physicians, and lawyers throughout the South and Midwest until January 29, 2003, when ROA was placed in receivership by the Circuit Court of the City of Richmond, Virginia. The complaints accuse the petitioners of engaging in what is essentially a two-part conspiracy to defraud AHAT and BHS. They allege that the petitioners conspired with other defendants to induce AHAT and BHS to exchange their equity interests in the trust for "ROA securities,"[4] and that, through a series of transactions with ROA between January 2001 and June 2002, AHAT and BHS lost approximately $50 million and $5.6 million, respectively, as a result of the financial collapse of ROA. The initial transaction was embodied in a document entitled "Acquisition of Assets and Assumption of Liabilities Agreement," effective January 31, 2001. In June 2002, some of the hospitals were allegedly induced to make additional capital contributions to ROA ("the capital calls"). We refer to this aspect of the alleged enterprise as the "investment-fraud conspiracy."
According to the plaintiffs, the petitioners also allegedly conspired to deceive state insurance regulators and a prominent insurance-company rating agency by essentially falsifying data and records regarding ROA's financial status and its relationships with Gen Re and various other entities in order to encourage investments in ROA by the plaintiffs and others similarly situated. We refer to this part of the alleged enterprise as the "financial-reporting-fraud" conspiracy, a term coined by AHAT.
The petitioners challenged the exercise of the trial court's jurisdiction over them with supporting affidavits. They each *617 averred that they have never lived in Alabama and that they do not conduct business in this State. Subsequently, AHAT filed a "notice of service of discovery documents . . . related to personal jurisdiction issues." The trial court denied the petitioners' motions to dismiss, holding that AHAT's "complaint set forth allegations that establish sufficient contacts with this state to confer on this court personal jurisdiction over [the petitioners]." The petitioners have challenged that holding by petitioning for a writ of mandamus. AHAT and BHS have agreed to a stay of discovery, which the petitioners sought pending resolution of the jurisdictional issues by this Court. Consequently, the assertion of personal jurisdiction by AHAT and BHS rests entirely on the allegations in their complaints.
In that connection, we note that the claims against the petitioners in the consolidated complaints of AHAT and BHS are similar. However, AHAT's "tenth amended and restated complaint" is more detailed than the last amended complaint of BHS. The parties have focused their arguments on the sufficiency of the jurisdictional allegations in AHAT's complaint. Indeed, in its briefs to this Court, BHS expressly incorporates the facts and arguments set forth in AHAT's briefs "[i]n an effort not to be redundant." Therefore, we will restrict our discussion to the jurisdictional sufficiency of the more comprehensive tenth amended and restated complaint of AHAT.[5]

II. Discussion
Procedurally, jurisdiction over an out-of-state defendant is obtained pursuant to the "long-arm" rule, Ala. R. Civ. P. 4.2(b), as amended August 1, 2004. A person or entity is subject to jurisdiction under Rule 4.2(b) when that "person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States. . . ." Rule 4.2(b) now embodies the "catchall" clause that was found in subparagraph (I) of Rule 4.2 before it was amended. "The structure of former 4.2 included a `laundry list' of types of conduct that would subject an out-of-state defendant to personal jurisdiction in Alabama, as well as the `catchall' clause now contained in new 4.2(b)." Committee Comments to Amendment to Rule 4.2 Effective August 1, 2004. "[S]ubparagraph (I)[was] but a restatement of the current definition of the federal constitutional standard." Committee Comments on 1977 Complete Revision to Rule 4.2.
That standard "`is the minimum-contacts standard elucidated in International Shoe [Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ],'" and its progeny. Bearden v. Byerly, 494 So.2d 59, 61 (Ala.1986) (quoting Shaffer v. Heitner, 433 U.S. 186, 207, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). Under that standard, "[a] physical presence in Alabama is not a prerequisite to personal jurisdiction over a nonresident." Sieber v. Campbell, 810 So.2d 641, 644 (Ala.2001). What is required, however, is that the defendant have such contacts with Alabama that it "`should reasonably anticipate being haled into court [here].'" Dillon Equities v. Palmer & Cay, Inc., 501 So.2d 459, 462 *618 (Ala.1986) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).
The standard is met where "the defendant [has] `purposefully availed' itself of conducting activity in the forum state, by directly targeting its [activities at] the state." Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 454 (3d Cir.2003). "`This purposeful-availment requirement assures that a defendant will not be haled into a jurisdiction as a result of "`the unilateral activity of another person or a third person.'" '" Ex parte Dill, Dill, Carr, Stonbraker & Hutchings, P.C., 866 So.2d 519, 525-26 (Ala.2003) (quoting Elliott v. Van Kleef, 830 So.2d 726, 731 (Ala. 2002), quoting in turn Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Thus, the ultimate question under Rule 4.2(b) is the same as under former Rule 4.2(a)(2)(I), namely, whether the out-of-state defendants have "some minimum contacts with this state [that] . . . it is fair and reasonable to require [them] to come to this state to defend an action." (Emphasis added.)
According to the petitioners, dismissal "is required because [AHAT's] complaint does not contain a single allegation describing any act committed by Reindel, Kellogg, or Seeger that occurred in Alabama, that was expressly aimed at Alabama, or that was directed [at] any identified or identifiable Alabama plaintiff." Reply brief, at 11 (emphasis added). AHAT and BHS implicitly concede that the petitioners have not personally performed such overt acts. Their theory of jurisdiction, however, is that the petitioners were members of a "conspiracy in which they not only knew but directed their co-conspirators' actions in Alabama in furtherance of the goals of the conspiracy, which caused [AHAT and BHS] to suffer injury." AHAT's brief, at 5.[6] Moreover, according to AHAT, the trial court properly refused to dismiss the claims against the petitioners, because, AHAT argues, they failed to "rebut the key conspiracy allegations [of AHAT's complaint] upon [which] the circuit court's personal jurisdiction over them is based." AHAT's brief, at 5-6 (some emphasis added).

A. Key Conspiracy Allegations
AHAT's complaint describes purported activities conducted by more than 18 individuals and entities from approximately 1991 to 2002 that are best characterized as a two-phased conspiracy. The phase constituting the bulk of the allegations of the complaint is the financial-reporting fraud.
1. Financial-reporting fraud
The alleged financial-reporting fraud principally consists of 13 or 14 interrelated but distinct "schemes," which AHAT identifies in its brief by the selective grouping of paragraphs from its complaint. Only a few such schemes, however, are specifically alleged to be applicable to the petitioners.
For example, AHAT alleges that the petitioners conspired with codefendants Kenneth R. Patterson, Carolyn B. Hudgins, and John William Crews, executive officers of ROA, to enter into a number of agreements involving Gen Re, ROA, and First Virginia Reinsurance, Ltd. ("FVR"). FVR, a Bermuda corporation, was allegedly *619 created "to serve as a reinsurer of all of ROA's retained share of risk on [its] physician and lawyer business."[7] Amended and Restated Complaint, at ¶ 116. AHAT alleges that these agreements included sham risk-transfer arrangements, "variously referred to as `aggregate stop loss/funding cover,' . . . `noncontractual understandings,' and `finite contracts,'. . . . masquerad[ing] as legitimate business arrangements while serving [the] improper purposes of manipulating the reported financial condition of ROA . . . and underreporting [ROA's] liabilities," which "transactions were actually loans from Gen Re to FVR . . ., guaranteed by ROA." Amended and Restated Complaint, ¶ 156 (emphasis added).
Another such scheme allegedly involved a plan that allowed Gen Re to "pass ROA business," that is, "FVR-reinsured risk," through Gen Re "to FVR pursuant to retrocession agreements between Gen Re and FVR ['the retrocession agreements']." FVR's performance under the retrocession agreements was secured by assets held in Bermuda financial institutions under trust agreements to which FVR and Gen Re were allegedly parties ("the Bermuda trusts"). AHAT alleges that the petitioners, along with Patterson and Hudgins, "conspired to make a disguised transfer of $10 million from ROA to the Bermuda trusts," which had become underfunded. ¶ 204. According to AHAT, the transfer was "fraudulently accounted for as a prepayment of reinsurance premiums to Gen Re, . . . thereby inflating ROA's surplus to policyholders by $10 million." ¶ 205 (emphasis added).
Yet another scheme allegedly involved Patterson, Hudgins, and the petitioners in the formulation of an "unreported side agreement" in the year 2000 between Gen Re and ROA, which was designed "to limit or eliminate Gen Re's reinsurance risk of loss, while maintaining the illusion that Gen Re continued to bear a substantial insurance risk of net loss under the Gen Re/ROA reinsurance treaties." ¶ 183. The agreement allegedly contemplated "a cap in the amount of $140 million on Gen Re's aggregate liability to ROA." ¶ 186. According to AHAT, this agreement was not disclosed to insurance regulators in "ROA's annual statement for the year 2000," ¶ 199, and was intended to "arrest and improve ROA's deteriorating financial condition while evading the enhanced regulatory monitoring[[8]] that would be triggered if ROA's RBC [risk-based capital] were to fall below 200% of ACL [authorized control level], or Company Action Level RBC." ¶ 185 (emphasis added).
The essence of all the schemes forming the basis of the financial-reporting-fraud allegations against the petitioners is that the petitioners conspired with other defendants, particularly officers of ROA, to conceal and misrepresent the progressively precarious financial status of ROA. Among the alleged objects of this fraud were various state departments of insurance, including those of Tennessee, Virginia, and Alabama, which allegedly would have initiated regulatory measures had they been given accurate information.
*620 Another alleged object of the fraud was the insurance-rating company, A.M. Best Company, Inc. ("Best").[9] According to AHAT, ROA was rated "A" by Best in January 2001, and certain defendants used this rating as an incentive for AHAT and BHS to invest in ROA. More specifically, AHAT alleges that "if ROA's and its affiliates' difficulties and problems and true condition had been timely disclosed to Best, among others, such ratings would not have been issued at the levels they were issued, and the Plaintiffs would not have entered into the transactions with the Defendants described in [the] complaint." ¶ 28 (emphasis added). In other words, the schemes constituting the financial-reporting fraud set the stage for the alleged investment-fraud conspiracy.
2. Investment fraud
The investment fraud allegedly occurred when certain defendants induced AHAT and BHS to invest in ROA, beginning in January 2001 and thereafter, through the exchange of AHAT's and BHS's equity in the trust for ROA securities and the subsequent capital calls. For example, AHAT's complaint alleges:
"On September 14-17, 2000, at a meeting of the Trustees and Board[ ] of . . . [the trust] . . ., Patterson made [a] presentation to induce Plaintiffs to merge or combine with ROA, which included some or all of [the] aforesaid material misrepresentations regarding the financial condition of . . . [ROA and] FVR. . . . Also attending this meeting were . . . Hudgins . . . and James Olzacki,[[10]] Executive Vice President of Gen Re."
¶ 57. It also alleges:
"With regard to the . . . three individual Gen Re defendants (Reindel, Seeger . . . and Kellogg), they were intimately involved for a period of many years in the conspiratorial schemes which were intended to, and did, deceive and mislead the Alabama [Department of Insurance] and persons in Alabama doing business with ROA and its units . . ., with respect to ROA's . . . financial condition and operations, and with their knowledge and consent their co-conspirators, such as Crews, Patterson, . . . Hudgins, and others at ROA did business with and carried on contacts with the Plaintiffs and others in Alabama, as part of carrying out the joint conspiratorial schemes. Moreover, their actual and de facto agents, such as . . . Ken Patterson of ROA, personally came to Alabama to make presentations to the Plaintiffs with respect to Gen Re, in the context of AHAT doing business with ROA."
¶ 36(ii) (emphasis added). Finally, it alleges:
"Gen Re (1) regularly did large amounts of business in Alabama, including dealings with various Plaintiffs and reinsurance provided by Gen Re to AHAT, . . . (2) made substantial amounts of premiums, profits and other benefits off of doing business with and for both Plaintiffs and ROA and its affiliated entities and [Patterson, Crews, and Hudgins]; . . . [and 3] knew and foresaw that its widely publicized reinsurance *621 backing of ROA would be relied upon by passive investors and equity subscriber interest holders like [AHAT]. . . . Gen Re, acting through individual defendants Reindel, Kellogg and Seeger, was not only aware of but fully approved the AHAT acquisition and the resulting inclusion of Plaintiffs' surplus in ROA's financial system, and the resulting issuance of subscriber equity accounts to Plaintiffs, and, through such individual defendants, it was also aware of and fully approved the making of the 2002 capital call offers to the Plaintiffs. . . . "
¶ 435 (emphasis added). Under AHAT's theory of jurisdiction, "the actions and omissions of [individuals such as] Crews, [Patterson, and Hudgins] are imputed and attributable to [all] the other defendants," such as the petitioners. ¶ 395 (emphasis added).
The petitioners contend that the exercise of jurisdiction on the basis of such a theory does not comport with the due-process requirements of International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. More specifically, they contend that AHAT's theory unconstitutionally dispenses with the "`purposeful availment requirement[, which] assures that a defendant will not be haled into a jurisdiction as a result of "`the unilateral activity of another person or a third person.'"'" Ex parte Dill, Dill, Carr, Stonbraker & Hutchings, P.C., 866 So.2d at 525-26 (quoting Elliott, 830 So.2d at 731, quoting in turn Burger King Corp., 471 U.S. at 475, 105 S.Ct. 2174). For that proposition, they cite cases from other jurisdictions refusing to recognize conspiracy-based jurisdiction. See, e.g., Karsten Mfg. Corp. v. United States Golf Ass'n, 728 F.Supp. 1429, 1434 (D.Ariz.1990); Mansour v. Superior Court, 38 Cal.App.4th 1750, 46 Cal. Rptr.2d 191 (1995).
AHAT and BHS rely on general principles of conspiracy liability;[11] on cases from other jurisdictions, see, e.g., United Phosphorus, Ltd., v. Angus Chem. Co., 43 F.Supp.2d 904 (N.D.Ill.1999); Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc., 410 F.Supp.2d 592 (E.D.Ky.2006); Chenault v. Walker, 36 S.W.3d 45 (Tenn.2001); and on recent cases in which this Court recognized, at least in theory, the concept of conspiracy jurisdiction. See Ex parte United Ins. Cos., 936 So.2d 1049 (Ala. 2006); Ex parte Bufkin, 936 So.2d 1042 (Ala.2006); and Ex parte McInnis, 820 So.2d 795 (Ala.2001).
United Insurance involved claims by Patricia Jackson against her health insurer, MEGA Life and Health Insurance Company ("MEGA"), and various foreign entities, which, she alleged, had conspired with MEGA to mislead Jackson regarding, among other things, the "`true nature of the relationship between the Defendants, [and] . . . the full and true nature and manner in which premiums and premium increases would be determined and/or calculated for [Jackson].'" 936 So.2d at 1051. The alleged foreign conspirators sought a writ of mandamus directing the trial court to "vacate its order denying their motions to dismiss the complaint against them and to grant their motions to dismiss for lack of personal jurisdiction." 936 So.2d at 1052. We denied the petition, holding that *622 Jackson's complaint pleaded the existence of a conspiracy with sufficient specificity to entitle her to engage in jurisdictional discovery. 936 So.2d at 1056.
The result in Bufkin was similar. That case arose out of an automobile accident in Tennessee involving George Roberts, and John Bufkin, a Mississippi resident, who, at the time of the accident, was operating a vehicle belonging to Alabama resident Byron Williamson. 936 So.2d at 1044. Roberts's complaint against Bufkin and Williamson alleged that "`[a]t the time of the accident complained of, [the foreign defendant] was the agent, servant or employee of [the Alabama defendant] and/or was involved in a joint venture with [the Alabama defendant].'" 936 So.2d at 1046 (emphasis added). Bufkin sought a writ of mandamus directing the trial court to vacate its order denying his motion to dismiss for lack of personal jurisdiction. We denied the petition, concluding that Roberts had "`at least alleg[ed] facts that would support a colorable claim of jurisdiction,'" 936 So.2d at 1047, and was, therefore, entitled to discovery on the jurisdictional issue. In neither Bufkin nor United Insurance were we compelled to define the contours of conspiracy jurisdiction. Neither are we compelled to do so in this case. This is so, because, as AHAT points out, although "the petitioners submitted affidavits in support of their motions, . . . the affidavits did not rebut, or even address, the key factual allegations on which [AHAT's] argument for jurisdiction is based." AHAT's brief, at 19 (emphasis added). AHAT and BHS argue, in essence, that they met their threshold showing that jurisdiction is proper and that the petitioners failed to make their prima facie showing that the exercise of jurisdiction would be improper. We agree.

B. Threshold Showings
The affidavit filed by Reindel stated, in toto:
"1. I have been employed by [Gen Re] in Stamford, Connecticut[,] since 1983.
"2. I have personal knowledge of the facts stated in this Affidavit and am competent to testify to the same.
"3. I live and work in Fairfield County, Connecticut. I have never resided, or maintained a place of employment, in Alabama.
"4. I do not conduct business in Alabama. In particular, I:
" do not maintain, and have never had, an office in Alabama;
" do not own or possess, and have never owned or possessed, any real property or hold any mortgages or liens in Alabama;
" do not have, and have never had, any bank accounts in Alabama;
" do not have, and have never had, any telephone listings in Alabama;
" do not have, and have never had, any employees or authorized agents in Alabama;
" have never been a litigant in the courts of Alabama or availed myself of the courts of Alabama;
" have not incurred or paid taxes in Alabama; and,
" have not derived any income from business in Alabama.
"5. In the last ten years, I have not visited Alabama for any reason.
"6. I had no dealings with the Plaintiffs of any kind relating to their decision to pursue the business combinations and capital calls referred to in the Complaint in the above-captioned action. In particular, I was in no way involved in negotiating or promoting the `Acquisition of Assets and Assumption of Liabilities Agreement' between AHAT and ROA referred to in ¶ 3 of the Complaint. *623 I was also in no way involved in negotiating, soliciting or promoting the voluntary capital contributions of June 2002 referred to in ¶ 4 of the Complaint.
"7. I have never contracted to supply or obtain services or goods to or from Alabama.
"8. Given my lack of contacts with the State of Alabama, I have never expected that I could properly be sued therein."
Kellogg's affidavit was identically worded, except to say that he had worked for Gen Re in Greenwich, Connecticut, "from 1968 to May 2001," and had not visited Alabama in the last seven years. Seeger's affidavit was also identically worded, except for paragraphs 1, 3, and 5, which stated:
"1. I am employed by General Star (`GenStar') in Stamford, Connecticut. I have been employed with GenStar since February 2002. From October 1986 through January 2002, I was employed by [Gen Re] in Stamford, Connecticut.
". . . .
"3. I live and work in Stamford, Connecticut. I have never resided, or maintained a place of employment, in Alabama.
". . . .
"5. I have traveled to Alabama only once. The trip did not involve meeting with, or communicating with, the Plaintiffs."
None of these affidavits deny the existence of a conspiracy, or the affiant's participation therein. The affidavits are addressed, instead, to more conventional bases of jurisdiction, such as those embodied in the "laundry-list" provisions of Rule 4.2 before its 2004 amendment. However, the fact that a jurisdictional basis is not found within the laundry list "does not prevent a threshold finding of jurisdiction under the conspiracy theory," pursuant to Rule 4.2(b). McLaughlin v. Copeland, 435 F.Supp. 513, 532 (D.Md.1977).
The petitioners concede, as they must, that the defendant must "make[ ] a prima facie evidentiary showing that the court has no personal jurisdiction [before] `the plaintiff is . . . required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof.'" Petition, at 12-13 (emphasis added). Our cases say as much. See Ex parte United Ins. Cos., 936 So.2d at 1053 ("`"[I]f the defendant makes a prima facie evidentiary showing that the Court has no personal jurisdiction, `the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof. . . .'"'"); Bufkin, 936 So.2d at 1045 ("`However, if the defendant makes a prima facie evidentiary showing that the Court has no personal jurisdiction, "the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof. . . . "'").
To be sure, the conspiracy averments in the complaint must exceed "bald speculation" and mere conclusory assertions. Ex parte McInnis, 820 So.2d at 806-07. However, this burden is not heavy, especially "[w]hen determination of the jurisdictional facts is intertwined with and may be dispositive of questions of ultimate liability." McLaughlin v. Copeland, 435 F.Supp. at 530. This is so, because "[t]o require a more substantial showing in a case alleging a civil conspiracy would be . . . `harsh, if not impossible' in view of the difficulties of pleading and proving a conspiracy." Id. (quoting Mandelkorn v. Patrick, 359 F.Supp. 692, 696 (D.D.C.1973)).
Moreover, until "controverted by the defendant's affidavits," the plaintiff's jurisdictional allegations must be considered *624 as true. Wenger Tree Serv. v. Royal Truck & Equip., Inc., 853 So.2d 888, 894 (Ala.2002)(emphasis added). Thus, where the complaint alleges conspiracy-based jurisdiction with particularity, failure to deny by affidavit or deposition the existence of, or participation in, a conspiracy will result in a denial of a motion to dismiss for lack of jurisdiction. See McLaughlin, supra; Mandelkorn, supra. AHAT's complaint meets the specificity threshold.
As illustrated previously in this opinion, AHAT alleges facts purporting to show that the petitioners, in the financial-reporting-fraud phase, conspired with Patterson, Hudgins, Crews, and others to conceal and to misrepresent the progressively precarious financial condition of ROA by, among other things, (1) underreporting the liabilities of ROA, and (2) inflating the surplus of ROA, in order to avoid intervention by various state insurance departments, and, ultimately, to present ROA to AHAT and BHS in a posture conducive to investment through the investment-fraud conspiracy. Relative to the investment fraud, the complaint alleges that the petitioners  in the historical context of Gen Re's relationships with, and reinsurance of, AHAT  knew and approved of the negotiations with AHAT for its investments in ROA, which were conducted by and through their alleged co-conspirators, Patterson, Crews, and Hudgins. It further alleges that some of these negotiations occurred in Alabama.
Without doubt, the petitioners were required to controvert by affidavit or deposition these specific allegations. However, their affidavits did not do so. They reveal nothing material to the conspiracy theory on which jurisdiction purports to stand. Defendants contesting in personam jurisdiction cannot meet their prima facie evidentiary burdens with affidavits having nothing to do with the relevant issues. At this stage in the litigation, therefore, it is not unfair or unreasonable to require the petitioners "to answer here for their roles in the alleged course of events." Mandelkorn v. Patrick, 359 F.Supp. at 696-97 ("Assuming as true the unchallenged allegations of conspiracy, . . . [there is] no injustice in requiring . . . the New York and Florida Defendants to submit to suit [in the District of Columbia].").
In that connection, it must be remembered that "[a] denial of a . . . motion to dismiss for want of personal jurisdiction is interlocutory and preliminary only." Ex parte McInnis, 820 So.2d at 798. "After such a denial, the continuation of personal jurisdiction over a defendant who appropriately persists in challenging it in [an] answer to the complaint and by motion for summary judgment or at trial depends on the introduction of substantial evidence to prove the . . . jurisdictional allegations in the . . . complaint." Id.

III. Summary
In summary, the trial court did not err in denying the petitioners' motions to dismiss the claims against them. This Court has previously recognized  albeit in the abstract  that personal jurisdiction may be grounded on a conspiracy theory of imputed conduct.[12] We do not exclude the possibility that, under some circumstances, imputing conduct to an alleged coconspirator who has personally performed no overt act in Alabama might violate principles of due process as set forth in International Shoe and its progeny. However, in light of the procedural posture of this case, it is unnecessary to go beyond AHAT's, and hence BHS's, threshold showing of jurisdiction, *625 because the petitioners have not made a prima facie evidentiary showing of the absence of jurisdiction. For these reasons, the petition is denied.
PETITION DENIED.
COBB, C.J., and SEE, LYONS, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs in the rationale in part and concurs in the result.
MURDOCK, Justice (concurring in the rationale in part and concurring in the result).
The main opinion states that "the conspiracy averments in the complaint must exceed `bald speculation' and mere conclusory assertions." 963 So.2d at 623 (citing Ex parte McInnis, 820 So.2d 795, 806-07 (Ala.2001)). The opinion then states: "However, this burden is not heavy, especially `[w]hen determination of the jurisdictional facts is intertwined with and may be dispositive of questions of ultimate liability,'" 963 So.2d at 623 (quoting McLaughlin v. Copeland, 435 F.Supp. 513, 530 (D.Md.1977)). The opinion further states that the reason "this burden is not heavy" is "because `[t]o require a more substantial showing in a case alleging a civil conspiracy would be . . . "harsh, if not impossible" in view of the difficulties of pleading and proving a conspiracy,'" id. (again quoting McLaughlin, 435 F.Supp. at 530, in turn, quoting Mandelkorn v. Patrick, 359 F.Supp. 692, 696 (D.D.C.1973)).
As I read McLaughlin and Mandelkorn, the above-quoted passages from those cases address the evidentiary showing required of a plaintiff seeking to base in personam jurisdiction upon a defendant's involvement in a conspiracy. That evidentiary showing is, as explained in the main opinion, something different from the plaintiff's pleading requirement and, in fact, need not be made unless and until the defendant makes a sufficient evidentiary showing to rebut the plaintiff's conspiracy allegations. I therefore am concerned that the main opinion may be read as suggesting that, in a case where a plaintiff seeks to rely upon a conspiracy to establish a court's in personam jurisdiction over a defendant, the plaintiff's pleading burden is not a relatively "heavy" one  insofar as pleading requirements go. Indeed, as the full passage from Ex parte McInnis, which is referenced by the main opinion, states: "`"Bald speculation" or a "conclusionary statement" that individuals are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory. . . . Instead, the plaintiff must plead with particularity "the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy."'" 820 So.2d at 806-07 (quoting Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1031 (D.C.Cir.1997) (citations omitted)).
This Court, in McInnis, emphasized that a "`"`"defendant's conduct and connection with the forum state [must be] such that he should reasonably anticipate being haled into court there,"'"'" 820 So.2d at 803 (emphasis omitted) (quoting Sudduth v. Howard, 646 So.2d 664, 667 (Ala.1994)), and that "`a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum state,'" 820 So.2d at 804 (quoting Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). Applying these principles, as well as the above-quoted principle that a complaint must include more than conclusory assertions, the McInnis Court held that the allegations of the complaint in that case relating to one of the named defendants, Borka, were insufficient to make out a case for in personam jurisdiction over him:

*626 "[W]hile the last cause of action in the plaintiff's amended complaint expressly alleges that McInnis, Borka, and Shingleton, as well as other defendants, conspired together in most aspects of their alleged tortious conduct, these pleadings do not allege that they conspired together in marketing the product within Alabama. . . . Absent express and sufficient allegations of either agency . . . or a conspiracy between or among Borka and McInnis, Shingleton, or both, specifically to develop Alabama as a market, we cannot impute to Borka for the purpose of supporting personal jurisdiction over him, either the intentions and purposes of McInnis or Shingleton to develop Alabama as a market or their physical presences in Alabama."
Ex parte McInnis, 820 So.2d at 806-07 (emphasis added).
It is based upon those allegations of the complaint that, as described in the main opinion, allege a conspiracy directed at Alabama and entities in Alabama, and upon the shortcomings of the petitioners' evidentiary showings in response to those allegations, that I concur in the result reached by the main opinion. In so doing, I would echo what this Court, quoting Justice Houston's special concurrence in Ex parte Sekeres, 646 So.2d 640, 642 (Ala. 1994), said in McInnis: "`It may well be that in personam jurisdiction of [the petitioners] exceeds the limits of due process, but I cannot say, based upon the record now before this Court, that the trial court clearly erred in denying the motion to dismiss or that [the petitioners have] a clear and indisputable right to be dismissed from this action'" at this stage in the proceedings. Ex parte McInnis, 820 So.2d at 806.
NOTES
[1] This action was commenced in April 2004.
[2] According to AHAT's 223-page tenth amended and restated complaint, the statutory scheme in § 22-21-240 et seq. "authorizes hospitals to enter into a trust agreement . . . to contribute funds to the trust for the purpose of self-insuring the member hospitals against professional and general public liability claims, based upon acts or omissions of such hospitals, including . . . claims based upon malpractice."
[3] This action was commenced in July 2004.
[4] The exchange essentially resulted in the merger of the trust with ROA.
[5] "`[A] petition for a writ of mandamus is the proper device by which to challenge the denial of a motion to dismiss for lack of in personam jurisdiction.'" Ex parte Troncalli Chrysler Plymouth Dodge, Inc., 876 So.2d 459, 463 (Ala.2003)(quoting Ex parte Dill, Dill, Carr, Stonbraker & Hutchings, P.C., 866 So.2d 519, 525 (Ala.2003)). See also Ex parte McInnis, 820 So.2d 795 (Ala.2001); Ex parte Paul Maclean Land Servs., Inc., 613 So.2d 1284, 1286 (Ala.1993).
[6] In other words, AHAT and BHS allege that contacts with Alabama that are related to the alleged conspiracy give rise to specific, as opposed to general, personal jurisdiction. See Elliott v. Van Kleef, 830 So.2d at 730-31 (discussing the difference between general personal jurisdiction and specific personal jurisdiction).
[7] FVR has also been placed in receivership. The complaint describes FVR as an "offshore captive affiliate" of ROA.
[8] See, e.g., the Alabama Risk-Based Capital for Insurers Act, Ala.Code 1975, § 27-2B-1 et seq., which mandates progressively comprehensive managerial control by the Commissioner of Insurance, inversely proportional to the ratio of the insurer's "total adjusted capital" to its risk-based capital, §§ 27-2B-5 to -7, as indicated in the insurer's annual "adjusted RBC report." § 27-2B-3.
[9] "Best is one of five organizations designated as a Nationally Recognized Statistical Rating Organization by the United States Securities and Exchange Commission. A.M. Best issues financial strength ratings that measure an insurance company's ability to pay claims." Fleet Global Servs., Inc. v. Republic Western Ins. Co. (Ms. 6:04-CV-954-ORL18JGG, Nov. 7, 2006) note 2 (M.D.Fla.2006) (not published in F.Supp.2d).
[10] Olzacki has not been made a defendant in this action.
[11] "Alabama recognizes [civil conspiracy] as a substantive tort." Purcell Co. v. Spriggs Enters., Inc., 431 So.2d 515, 522 (Ala.1983). "In essence, civil conspiracy is a combination of two or more persons to do: (a) something that is unlawful; [or] (b) something that is lawful by unlawful means." Id. See also Eidson v. Olin Corp., 527 So.2d 1283, 1285 (Ala. 1988). "In a conspiracy, the acts of coconspirators are attributable to each other." Williams v. Aetna Fin. Co., 83 Ohio St.3d 464, 476, 700 N.E.2d 859, 868 (1998).
[12] Indeed, the petitioners do not contend that jurisdiction may not, under any circumstances, be based on conspiracy allegations and imputed conduct.